O. W. PILCHER and Constance Groves
Pilcher, Appellants (Plaintiffs below),

v.

Adolph S. HAMM and Evelyn M. Hamm,
Appellees (Defendants below).

No. 2914.

Supreme Court of Wyoming.

May 11, 1960.

Steadman & Steadman, Cody, for appellants.

Goppert & Fitzstephens, Cody, for appellees.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

O. W. and Constance Groves Pilcher brought suit against Adolph S. and Evelyn M. Hamm to quiet title to real estate and for certain moneys claimed to be due. The suit was the aftermath of three successive agreements relating to the sale of a ranch, cattle, and equipment by the Pilchers to the Hamms; the first on August 8, 1955, providing for the sale of the ranch, livestock, and chattels for $200,000; the second on January 30, 1956, extending the time for payment; and the third on December 6, 1956, purporting to settle the differences between the parties.

Prior to the time that the matter came up for hearing, the defendants had given plaintiffs a deed for the real property, and at the pretrial conference it was recited that plaintiffs were entitled to the real estate. The court entered judgment accordingly and also allowed plaintiffs as full settlement of all matters and transactions between the parties a sum substantially less than that claimed. Plaintiffs have appealed, urging that they were entitled to receive the proceeds of a $100,000 mortgage placed on the real estate by the defendants but that defendants had improperly diverted a portion thereof which had been used as payment of attorney fees, 1956 taxes, interest on the loan, rentals, and title insurance premium.

The plaintiffs under Rule 75(a), W.R.C.P., designated the pleadings and certain exhibits as requisite for the record on appeal. Later, after defendants had designated certain other exhibits and a portion of the transcript, the plaintiffs filed a further designation of the *entire transcript* of the testimony which defendants moved to strike, contending that Rule 75 does not contemplate nor permit any further or second designation. In response plaintiffs argue that such a holding would require all appellants as a self-protective measure to initially designate the entire record, thereby defeating the primary purpose of the rule, the simplification of an appeal.

It is appellant's duty to designate the contents of the record, and he should designate enough thereof to permit a full presentation of his points. Blake v. Trainer, 79 U.S.App.D.C. 360, 148 F.2d 10; 3A Barron and Holtzoff, Federal Practice and Procedure, rules ed. 1958, § 1582. This subdivision of the rule allows an additional designation by other parties, including an appellee, but it is not contemplated that such right be abused by an appellee's bringing in material unrelated to the points on which the appeal is taken. A party designating additional matters to be included in the record should avoid requesting those which are inessential. In re Joshua Hendy Iron Works, D.C.Cal., 2 F.R.D. 244; 7 Moore's Federal Practice, 2 ed., § 75.04. Thus, an appellant who has covered the points which he intends to contest should ordinarily require no additional designation, and it is expected that counsel on both sides will co-operate to present all of the record essential to the determination of the points raised by the appeal and omit all matter not bearing on such points. Blake v. Trainer, supra. If notwithstanding conscientious effort of both parties to comply with the spirit of the rule a record is incomplete or inaccurate, it is within the power of the district court under the provisions of Rule 75(h), W.R.C.P., to direct a supplemental record to be certified and transmitted. Drybrough v. Ware, 6 Cir., 111 F.2d 548.

■ Here appellees apparently thought the questions presented by appellants could not be resolved without a consideration of portions of the testimony, and a designation thereof would reasonably require that the remainder of the testimony be made available. Accordingly, considering all the circumstances, the oversight of appellants in securing an order of the trial court to present the supplemental record should be excused and the motion to strike must be overruled.

■ As to the merits of the case, the parties entered into three different agreements relating to the sale of the ranch property for the sum of $200,000. The first one provided that the purchase price was to be paid $5,000 cash, $20,000 within approximately two months, and the $175,000 balance in approximately five months. The second one, executed after $25,000 had been paid, extended the first agreement and provided for the remaining payments to be made: $20,000 in cash, $100,000 from the proceeds of a Prudential Insurance Company loan, and $55,000 by a note from buyers secured by a second mortgage on the ranch. The third one, which we will later discuss in some detail, incorporated the first two agreements by reference and provided for a settlement between the parties. Plaintiffs insist that the three agreements must be interpreted together. Numerous authorities are cited on the point, but it is unnecessary to discuss them since this is conceded by the defendants. Plaintiffs further contend that the court cannot make a new contract for the parties but must interpret the one actually executed, and this too is conceded. The only issue in the case therefore is the effect of including by reference in the settlement agreement the first two instruments which the parties executed. In Fuchs v. Goe, 62 Wyo. 134, 163 P.2d 783, 166 A.L.R. 1329, we said that the cardinal rule in the construction of contracts is that the intention of the parties as exhibited by the language they have used shall govern.

Several provisions of the settlement agreement here seem to us significant. In that instrument, following the usual formalities, it is stated that the original and extension agreements are therein incorporated by reference and that the Hamms have "now found it impossible to carry through on the original Agreement or the Extension Agreement." Thereafter it is recited that the Pilchers had deeded the real property to the Hamms who had mortgaged to the insurance company for $100,000 and given the Pilchers a second mortgage for $55,000; that the Pilchers had also given a bill of sale for the cattle to the Hamms who had mortgaged them to a Cody bank for $25,000. It was then stated, "in order to settle the differences between the parties hereto, they have this day agreed and they do hereby agree that as follows." The points of agreement listed were: the Hamms' obligation to give the Pilchers a bill of sale for the cattle and crops; the Pilchers' obligation to forthwith liquidate the livestock and apply the proceeds first to the $25,000 bank note, second to some $1,225 of bills previously contracted by the Hamms, and third to the $55,000 note. The Hamms promised a reasonable effort to secure from outside sources sufficient moneys to pay before January 15, 1957, the balance of the $55,000 note, they to have a conveyance of all chattels remaining on the ranch provided that they paid the note, and if the note was not paid the Pilchers to have a quitclaim for the realty and chattels, the Pilchers to liquidate the chattels by sale on or before April 1, 1957. If sufficient funds were realized from such liquidation to pay off the $55,000 note, the Pilchers would quitclaim the real property to the Hamms. If sufficient funds were not realized, the quitclaim from the Hamms to the Pilchers would become final and the Hamms would vacate the property, receiving $1,200 from the Pilchers.

Unfortunately, the settlement agreement does not show the whereabouts of the $100,000 proceeds of the Prudential Insurance Company loan. The original agreement contained no provision regarding a loan, and as far as that instrument indi-

cated, the Hamms were free to secure the $175,000 balance from any source they chose. The extension agreement showed that the balance of $155,000 was to be "paid $100,000.00 upon the closing of the loan to HAMM[S] from the Prudential," thereby clearly indicating that the money from the loan was to go first to the Hamms and be paid by them to the Pilchers. The evidence adduced at the trial disclosed that $87,000 had been received by the insurance company attorney, Housel, prior to the time of the settlement agreement, $1,000 of which he had paid to himself as part fee and $86,000 which he had turned over to the Pilchers with the Hamms' consent.

The trial court was confronted with the question, To whom did the $13,000 unmentioned in the settlement agreement belong? Actually, it was received by Housel on January 31, 1957, and then allocated, $3,000 to principal of the Prudential loan; $3,380.86 placed with the clerk of the district court; and $6,619.14 used for taxes, attorney fees, interest on the loan, public land rentals, and title insurance.

 Both parties have made some argument on the equities of the situation about which there might well be a difference of opinion. Although the original agreement made no reference to a warranty of title by Pilchers or an agreement to furnish good title, merely providing that they would deliver the deed and appropriate title documents to the Hamms for examination, there was, perhaps, an implied undertaking to defray the cost of perfecting title, and this may have related to the title insurance costs. The taxes, the interest on the loan during the time the Hamms had the property, and the fees for the leasing of land during that period were undoubtedly for the benefit of the Hamms and in equity should have been paid by them *if there was no agreement to the contrary*. However, we think the questions of the original equities and obligations between the parties were readjusted by the settlement agreement. Therein "in

order to settle the differences" the parties agreed to do certain things, and they made no reference whatever to the disposition of the insurance loan money. Moreover, the incorporation by reference of the previous agreements should not be taken to mean that such agreements are to be made effective unless specifically so stated. We do not think that the appellants can now successfully contend that they could sign an agreement whereby they would "settle the differences between the parties" and rely upon a carryover from a previous agreement as one of the things which they had in mind. The settlement was properly limited to that which was recited. Any holding to the contrary would permit a party to rely upon a final settlement agreement but simultaneously to superimpose upon it the most advantageous portions of agreements previously existing. In Hanover Canal Co. v. Wilson, 22 Wyo. 427, 143 P. 345, 352, where a second contract was made between the parties, we said:

"* * * it does not seem reasonable to assume that the damages for breach of the first contract were not considered when no rights were expressly reserved in respect to them; but, on the contrary, upon this record we may justly assume that the parties considered them settled as a part of the consideration for the second contract, especially as plaintiff was also in default for payments on the earlier contract. * * *"

See Snowball v. Maney Bros. & Co., 39 Wyo. 84, 270 P. 167, 271 P. 875, 61 A.L.R. 199; 55 Am.Jur. Vendor and Purchaser § 583; 91 C.J.S. Vendor & Purchaser § 119; Annotation, 6 Ann.Cas. 315; 6 Sixth Decennial Digest, Contracts, and 246; 30 Sixth Decennial Digest, Vendor & Purchaser, 

Under the facts and the applicable law, the trial court was fully justified in its judgment which must be affirmed.

Affirmed.